Mr. Bogan, when you're ready, we'll hear from you first. May it please the Court, Brad Bogan for Edgar Vasquez. The principal issue in this case is whether the parole commission plainly erred when it calculated Vasquez's sentencing guidelines range at the point where it was determining a release date for him after he had been transferred from Mexico to the United States to serve the sentence for an aggravated kidnapping that he was convicted of in Mexico. Now another issue here is what is the proper standard of review for this Court to use in assessing the parole commission's determination. And that turns on the language of the sentencing guidelines with respect to the enhancement at issue here. The parole commission applied an enhancement because a, quote, dangerous weapon was used in the course of committing the offense. And the guideline defines, or dangerous weapon is used, is a defined term under the kidnapping guideline. And it explains that with respect to a firearm, it either means discharge or it means that the firearm was otherwise used in the offense. And otherwise used is defined in Chapter 1 of the sentencing guidelines and is essentially defined in relationship to another term, brandishing. Now this Court has addressed the distinction between otherwise used and brandishing in another number of cases, principally under the robbery guideline, but the same definitions apply here. And in short, in order for a firearm to be otherwise used as opposed to merely brandished, the firearm does have to be present and it must be used to make a specific verbal or physical threat against the victim. It's not enough that the firearm is present and that the victim was intimidated by the presence of the firearm. There has to be that specific threat. Now in cases involving a robbery guideline, this Court has applied pretty much every standard of review possible to the decision whether the firearm was otherwise used or merely brandished. Some cases treat it as a factual question subject to clear error review. Other cases treat it as a mixed question of fact and law where the underlying facts are reviewed for clear error and the application of the guideline definition to the facts is reviewed de novo. Other cases have said abuse of discretion, which is just the general standard of review for sentences. Do you know of any circuit that's reversed the dangerous weapon enhancement on plain error review? Off the top of my head, no, I don't. But in terms of how this interacts with plain error review, this will be at step one, the question of whether there was error. If it's factual, then our case law would be we can't review it on plain error review. If it's legal, we could review it under the four prongs. Is that the point you're trying to make? Because I'm a little bit confused about where you're going with this. Well, yes. I mean, this Court has said that factual errors that could have been raised in the forum below cannot be plain error. And in my brief, I conceded that if we're subject to plain error, or excuse me, to a clear error review at step one of the plain error analysis, then we would lose, although I'm not sure I was correct to make that concession. Well, the U.S. Supreme Court may ultimately disagree with us on that, and that is certainly their prerogative. But under our case law, which is what binds us, absent, and I'm not aware of something pending that's going to come out today or tomorrow from the Supreme Court on this, this is the world we're in, which is facts that weren't challenged in the trial court or the whatever's being appealed can't be plain error, whereas law can be plain error. So if the judge gets the law wrong, nobody objects. We still can review it under the four prongs. That's the point that you're concerned about, right? That's what you're arguing. So you're saying, is this a factual conclusion that it was brandished versus something else, or is this a problem of the judge didn't understand the legal standard or the parole officer here, the parole commissioner didn't understand the legal standard? That's correct. And at least in terms of assuming it's a factual question subject to clear error review, I think the difference between the way that the parole commission operates in these circumstances as opposed to a district court imposing a sentence for a federal offense makes this court's rule about clear error and plain error not applicable. Part of the rationale that this court has offered for saying that factual errors cannot be plain error is that the district court is the best body to make those factual determinations in the first instance, because there is the opportunity for the parties to marshal evidence, for the court to weigh it, for the district court to assess witness credibility. And so the district court is in a better position than this court as a reviewing court to make those calls. But the parole commission doesn't do that. What the parole commission does is more akin to what this court does in reviewing a record from a district court. Because what happens when a prisoner is transferred from the foreign country, at least in this case, the Mexican judgment was translated into English, and that judgment contains all of the relevant factual findings in this case. And what happens is a probation officer who actually works for the district court and the relevant district prepares a post-sentence report, which is just like a pre-sentence report in federal cases. And based on the information from the foreign court documents, applies the sentencing guidelines. So there's no opportunity to call in witnesses. I mean, there is a provision under the procedures in these transfer cases for the defendant to testify if he wants to at the transfer hearing and with prior approval to present the testimony of interested parties. Did he testify here, in front of the hearing officer? In front of the hearing officer, yes. And the hearing is really an informal process. It's very hard to read, though, because it's so much inaudible. Right. It's one of the worst transcripts I've ever seen. Well, in my experience, it's typical of the transcripts of these transfer hearings. So you do these a fair bit? Well, not a fair bit. I've handled a handful of them. And you've come well-prepared. So I appreciate it. I have one sort of predicate question, because I was unaware of this whole treaty transfer system. But Judge King had told me it actually is pretty — it's used a lot. Is Rule 32 followed? No. And yet — and we're pretending this isn't a sentence. This is a release determination. Well, this — by statute, this Court reviews the release date determination as if it was a sentencing. I know. I know. 4106 says that. But then the treaty, Article 6, says we can't modify — U.S. courts cannot modify the sentence. Is the way they get around it, they being our court — and you probably know this law. I traced it back to a case called Cannon — that if we were to find error and remand, it's not a resentencing. And the Commission doesn't even have authority to give a lesser sentence. They'd have to adjust the supervised release to equal the total 20 years? Is that how it works? No. The — what the Parole Commission has to do, it has to determine a release date. Right. And it does have the power to determine a release date that is earlier than the release date that would have been in effect in the foreign country. That just seems flat contradictory to the treaty to me. Well, the law is well established that the court can do it. And I cannot remember if there's a specific — I thought the only way the law got us there would be if you reduced the prison sentence but enhanced the supervised release sentence so we can all pretend it's still the same sentence Mexico imposed. Well, the term of imprisonment plus the term of any supervised release cannot in the aggregate exceed — I know it can't exceed. I don't think it can go below either. But it's not an issue being raised here. Well, there is a — there is a report, and I don't have the citation to it at hand, that I believe goes along with the legislation that implemented the treaty, and it provides for the commission to effectively reduce the prison term if the transferee experienced torture and abuse in the foreign prisons. I think the idea is if you were abused for a week, that should count as two weeks. So to Judge Higginson's point, you are serving the term, but because your imprisonment was so horrible, it's like a week counts as two is, I guess, a better way to — I don't know that there's necessarily a — It's not in a direct tradeoff, but the point is you're being credited because the intensity of the service of your prison sentence was so horrible, you're being credited as if you served a little bit longer. That's how that's treated, the abuse in the foreign prison. Right. So that, say, 10 years in a U.S. prison would be the equivalent of 12 years or however long. Right. That's what I mean. I don't mean that it's one-for-one necessarily, but the — I think the — and I'm not sure it's really a fiction, but the fiction being employed is that you — it's like if I work really hard and I do more than somebody else in the same number of hours, maybe I get paid a bonus because I was much more productive in the same number of hours. So it's almost the negative equivalent of that. It was so horrible that we should give you really some extra hours credit for that time. That's how that's handled in my — I mean, I don't have as much experience as Judge King in it, but that's how I've seen it. Right. That would be one way to look at it. But if — Okay. But getting back to the matter at hand, we still — even district judges, while I agree that the sentencing hearing is — you typically can put on more evidence than whatever, but we have a lot of sentencing hearings that don't involve anything other than maybe the defendant's allocution, and we don't have live witnesses. And yet we defer to the district court's inferences. So if you could draw an inference from something, we defer to the district court's inference from that. And we say no evidence when there's really no evidence. And here what we have — it's very difficult to get these records, but anyway — in a statement provided by the victim, Perez-Chavez related that he was at his mother's residence mowing the lawn when two hooded individuals approached him, threatened him with a firearm, and forced him into a truck. So the question is, what would be an ordinary person — so this isn't — we're not talking about, like, sentencing guideline meaning of threatened. We're talking about, what does a normal person saying when they're threatened by a gun mean? And I don't think it's that the gun is sitting in somebody's pocket. I think it's, I'm threatening you with a gun. And isn't that at least a reasonable inference to draw from a colloquial use of the term, not, again, a sentencing guideline? We don't think Perez-Chavez is some sentencing guideline expert. A normal person saying I was threatened with a gun means I was threatened with a gun, pointing at me. And why isn't that a reasonable inference, and we're done, regardless of whether this is fact, law, or something in between? Well, a couple of answers. One, the language threatened with a gun or threatened with a firearm that appears in various places in the judgment is a translation from the Spanish, and it's entirely possible that there is some translation issue where you can't necessarily view the word threatened with a firearm the same way as you would if somebody was saying that in English. Second of all, that is an inference that could be drawn, but it's not the only inference that could be drawn, and it's not any more plausible, I would say, than that the kidnappers had firearms on them. But that we got rid of the equipoise rule in criminal cases where the burden of proof is beyond a reasonable doubt. We're not going to bring the equipoise rule back when it's just preponderance of the evidence, are we? So just because you could have two different inferences, we have that all the time. You could have two inferences from the same set of facts. Who gets to draw the inference then? The fact finder. And that's how we have to treat this parole commission person. I mean, to me, that's not a basis to say, well, you could have drawn a different inference. You also could have objected to the Spanish translation. That's also not, in my opinion, a fair... That's not a fair point, because then we can just throw this whole transcript out the window anyway. I mean, the whole thing is a translation. So we have no idea, right? We have to accept the English translation. You can't... It's chaos otherwise. And you had the right, your client did, to challenge the translation below if that was erroneous. So why can't the parole commissioner draw the inference here, or at least it's not plain error for the parole commissioner to do that? Well, the commission, because it's acting sort of like a district court does, can draw inferences, and that would be necessary because a foreign court's findings aren't necessarily going to map onto those that are necessary for application of the sentencing guidelines. However, again, I think this is a situation where the way that the parole commission operates here is different from that of a district court. To the extent that any inference was drawn, it was by the probation officer who prepared the post-sentence report and just said that the enhancement applied and used the threatened with a firearm language from the judgment. And then the hearing examiner who recommended that the commissioners adopt the pre-sentence report didn't elaborate on that particular point, just repeated the language from the pre-sentence report. And then the commissioners just signed the document determining a release date that said that the post-sentence report was adopted, but again, didn't elaborate on that point at all. So to the extent that any inference was drawn, it was just the probation officer looking at the judgment, looking at the guidelines, saying this enhancement applies. But beyond that, the record doesn't reflect that there was any consideration of the distinction between brandishment and otherwise use of a firearm. So how does that seriously affect the fairness of judicial proceedings if we say threatened with a firearm means he pointed it at you, good enough? I mean, how do we even get to prong four? Putting aside shocks of conscience, I mean, assuming we follow Escalante Reyes's majority opinion and not its dissent, still, how do we even get to prong four in this circumstance? I mean, you're just saying, well, they could have drawn an inference that's more favorable to your client. Fine. Why does it seriously affect the fairness and integrity of judicial proceedings to rule the other way from you? Because once the court gets to prong four, the first three prongs have already been satisfied. There is an error. It was clear or obvious. And it's reasonably likely that it resulted in, effectively, a longer sentence than Vasquez would have received but for that error. And we know that from Molina-Martinez. And in those circumstances, it's very difficult to see how an error, plain and obvious error, that results in somebody serving additional prison time would not seriously affect the fairness, integrity, and the public reputation of the proceedings. Well, I'm not sure we're going to get to prong four, and I realize the Supreme Court's considering prong four, but you just essentially said it's automatic. But I know your time's up. But I'll let you address that on rebuttal. So, thank you. You've reserved time. May it please the Court, Stratton Strand, on behalf of the government. As Judge Haynes's question suggested, this court is bound by the Lopez rule not to review this case at all. The Lopez rule establishes that a factual question can never be plain error. And this court's decision in De La Rosa from 1990 established that dangerous weapon enhancements are factual questions. De La Rosa is the earliest case. We acknowledge that the court in subsequent cases has said different things about whether it's a factual question or a mixed question. But De La Rosa is the earliest case and the earliest case controls. So this is a factual question under Lopez, even plain error review. What about his argument that, okay, Lopez is the law for the ordinary district judge sentencing case, but should not be extended to the more, the different process in this parole commission situation? What about that argument? It's incorrect because it's a very similar process. And in fact, the statute itself commands the court of appeals to review the determination as though it had been made by a district court. And then the process that the parole commission conducts is identical. The statute, again, requires the probation office to perform the exact duties specified in 3552A, which themselves reference Rule 32. The probation officer then prepares a post-sentence report, which is a perfect analog to the pre-sentence report, does an investigation, makes factual findings, recommends guidelines, ranges. And then the hearing officer holds a hearing, which is equivalent to the sentencing proceeding. And contrary to what counsel has suggested, evidence can, in fact, be submitted at that hearing. But crucially, is it or isn't it, is the hearing officer obliged to adhere to all of Rule 32's requirements? No. So it's not a... The hearing officer is required to follow the regulation, and the regulation directs the hearing officer to resolve all factual questions. And that's the key point here in terms of Lopez's application. I couldn't find a case where a circuit has ever vacated and remanded a sentence or released it, which made me think even more, no one's really thought through what happens if there is a sentencing irregularity, because we don't really know what would happen if you had to send it back to the hearing officer. They don't have to comply with Rule 32, but you're saying it's roughly equivalent? I believe the regulations address what would happen if there were a remand, and... The defendant would have to be present, and could allocute, and could call witnesses? If I could cite to 28 CFR 268, there's a provision for what happens in the case of a remand, and it says that the commission shall reopen and modify a determination that has been found to be in violation of the law, or have been imposed as a result of some error. But you have a thought on whether, can they call witnesses? And reopen, the general administrative reopening means reopen for the purpose at issue. And if I can, I'm trying to answer specifically your question. No, it's interesting. It's a weird world. But, I mean, the biggest provision that looked totally inconsistent with how we sentence people is, when I look at the treaty, the hearing officer can refer to, quote, any documents provided by the transferring country. So it looked to me like if Mexico sends a letter saying, yeah, the gun was visible and I pointed to that, the hearing officer could rely on that letter. The hearing officer is, in fact, required to look to consider all the documents provided. But the hearing officer still, and again, that could be reliable evidence in the same way that under the sentencing guidelines, if something has, you know. Your say isn't a problem in a sentencing case. But my point is, can the defendant have a witness from Mexico? Anyway, I guess I'm far afield. Yes. The answer is yes. Okay. The last question, then, on this, because you both know this much better than I do. Am I right that the only way we adhere to we can't modify the sentence is that the supervised release has to be a little gauge? Or is the point that my colleague made, which is we can sort of construe torture in prison to add months or reduce months. Am I right that the treaty itself says we can't do less than Mexico imposed? I read the treaty to say that you cannot exceed. But it says or set aside or modify. The exceeding provision is totally separate. You know, in Article VI, it says you can't modify or set aside. The reason I'm struggling with this is because this court has said different things. And Canon said that you can't modify. You can't go below. Yes. But I've seen cases in this court where lower sentences than have been affirmed. But it's always, I think, when you add the supervised release, you still get to what the transferring country had. I thought that's how we were doing it. I've seen one case where that was not correct. Okay. Go ahead. It was a month shy. But it's this issue with the torture or is it something else? It was something else. Because I thought, well, in this case, the torture was used to reduce at least the prison sentence. Yes. Okay. Yes. But again, I think my colleague's suggestion was that there's no basis for applying the Lopez rule because there's no opportunity really to draw factual inferences, to have any of the back and forth that occurs in a sentencing proceeding. And that's simply incorrect. Well, I'm not a fan of the Lopez rule. But I think you have to draw an inference here. And it seems to me that the parole commissioner is the right person to do it. Absolutely. And we would, even if this court were to decide to resolve this case in the alternative, you know, it's resolved against the appellant petitioner, both under Lopez and under the traditional plain error rule. If you get to traditional plain error, as Your Honor's question suggested, it's hard to see how this could be clear or obvious error. You have the probation officer. I mean, you have, in my opinion, I don't see them as equal inferences. The word threatened with a firearm, to me, in just the ordinary colloquial, and again, we have to accept the translation because that's what we've got, is pointing a gun at. Is it possible the gun could just be floating around somewhere and someone feels threatened? Yes. But I would say that's the less likely construction of if somebody came running in the door right now and goes, I was just threatened with a gun. In my mind, I would vision a gun being pointed at that person. That's what I would see as my very first inference of that. And then if I wanted, as a lawyer, to parse it down and examine it and come up with ten different things it could mean, yes, I could come up with other inferences. But I think the problem, really, for Mr. Vasquez, at least to me, is the most logical inferences, it was pointed. Absolutely. I think any person on the street looking at the petitioner's own statement that we intercepted the victim and using firearms physically forced him into the vehicle, or the eyewitness, hooded man, forced the victim into the vehicle with firearms, or the victim, I was threatened with a firearm, it's being pointed at the person. That's the most... It's not just sitting in somebody's back pocket. What's your best dangerous weapon enhancement that that's it? The only evidence was that it was threatened and the court said that's sufficient. Because the most plausible use of the word threat isn't brandishing or displaying, it's actually pointing. What's your best case? That's all we've got. Well, two answers to that. One is the guideline's definition. Brandishing is displaying all or even part of a weapon in order to intimidate. So threatening on its face implies something more than simply having visible. And the best case is probably the case that Your Honor penned, Sanchez, which recognizes that what is required is a direct physical, in the absence of a verbal threat, I'm going to shoot you. In the absence of a verbal threat, the otherwise used requires a direct physical threat caused by pointing or otherwise targeting. So it's not just pointing, it's otherwise targeting. And also, Sanchez says, in that case there was also no evidence that the firearm was even directed toward the victim. So here, where we have the testimony that I'm being threatened, it seems easily to fall within the notion of a direct physical threat of some kind, whether it's pointing, targeting, directing. And in terms of a case analogy, the best case is probably the Seventh Circuit case that you cited, Kruger, where the defendant held a handgun on his lap in order to keep the victim in the car, creating an implicit threat, I'm going to use this against you unless you stay in the car. In any event, what we have here is a probation officer inferring that the victim was threatened with a firearm while being physically forced into the truck. That is a reasonable interpretation of the record, and there's nothing to suggest that the probation officer or the commission misunderstood the definition, and there's nothing to suggest that that's an implausible reading of the record. I made the assumption that Mr. Vasquez could have challenged the translation. Is that true? In other words, if Mr. Vasquez, who presumably speaks Spanish, I don't know, maybe he doesn't, I don't know how that transpired, but whether he does or doesn't, someone could, and he could have that person examine the translation, and if that word in Spanish actually means something closer to brandishing, he didn't make the objection at all, but certainly could have objected to the word. I mean, I presided over a lot of trials where we had translators, often Spanish, but sometimes other languages, and I always ordered the jury on the premise that even if you speak this other language, you have to accept the English translation because we have to all be on the same page. And I have had people challenge, you know, lawyers come up there, they're not translating it right, whatever, and we resolve that. So . . . There was an opportunity here. Okay. And just like in normal sentencing, if the defendant objects to the post-sentence report, then there's an opportunity for the probation officer to go back and file an addendum addressing that. So here, had there been an objection to the translation of the documents that the probation officer relied on, that objection could have been made in response to the post-sentence report. That didn't happen. So here, we had two failures to object at opportune times. First, when the post-sentence report came out, and second, at the hearing. Again, no objection to the application of this enhancement. In fact, the AFPD specifically agreed that this was the correct guideline. So just out of an abundance of caution, I don't think that this case should get beyond the first or second prongs of the traditional plain error test, but even if you were to get to the final prong, there's no miscarriage of justice in this case. Here, the end result of this case was the defendant ended up with a 16-year release date instead of a 20-year sentence. There's no obvious effect on the sentence of applying this guideline because the hearing examiner made it clear that she was applying a non-guideline sentence. That's because of the torture. Because of the torture, and not just because of the torture. Well, but you have the whole Melina Martinez scenario of kind of, if I think I'm supposed to be giving you 235 and I want to reduce it for torture, then I'm working off the 235 instead of off of a 220 or whatever, which I might have reduced further. So that's the argument he would make. But that's a prong three. To me, prong four has to add something. And again, the U.S. Supreme Court has this very issue under shocks of conscience before it and may very well say it's automatic in sentencing cases, but then that would be eliminating prong four. And in the meantime, we have to apply prong four under the current law. Yeah. Here I think there are special circumstances. Here it's apparent that this was not a departure but a variance. This was the hearing examiner disagreed with the guidelines. She said it wasn't just the torture. She said the nature and circumstances of the criminal behavior was over-represented by the guideline. She said, look, this victim wasn't injured and was only held for a little while. She's disagreeing with the guidelines. And she also said, I don't think he should have to serve the entire 240-month sentence in prison. She's going off the statutory maximum. I think that he is not likely to re-offend, and I think that he would benefit from treatment in the community. Therefore, I'm going to choose 16 years plus four years for supervised release. That gets you to 20. She was choosing a specific sentence that she thought was appropriate. There's no way that any two-level guideline bump affected the sentence that she gave. So with that and the double failure to object, I think that it would be the negative effect on the public reputation of proceedings would be a remand in a case like this. Fair enough. OK. Thank you. We have your argument. Thank you. Thank you, Mr. Strands. All right, Mr. Bogan, you've saved time for rebuttal. First I'd like to address Mr. Strands' statement that this was a variance, not a departure. That's not the language that the hearing examiner or the commissioners used. In the hearing examiner's recommendation at page 192 of the record, she says, because of these factors, that is the torture as well as the over-representation of the seriousness of the offense conduct, I recommend a departure from the advisory guidelines. We have people use the wrong word on that a lot, so you look at what was the essence of what they were doing rather than the word. I agree, the word matters, but we certainly have district judges who say they're doing a departure when they're clearly doing a variance and vice versa. Right, but it does suggest that the guidelines range certainly have an anchoring effect. Here, a gravitational pull exerted on the decision. Commissioner does a de novo review of the hearing officer, or is there a deference? I'm not sure what their procedures are for that. I don't know the answer. All I know is that the hearing examiner makes a recommendation and then the commissioners decide whether to accept it or not. With no analysis, just yes or no becomes the sentence? As far as I know. And the appeal clock starts to run to the extent, well, it's not an appeal clock, this is a 2255. No, the statute provides for an appeal of the parole commission's determination, so it's a direct appeal or a petition for review of the agency's determination. Once the commission has ruled. Right, and the commission has to send that determination to the prisoner so that he can decide whether or not he wishes to challenge that. And then Judge Haynes, I'd like to respond to your question at the end of my opening argument about whether we're arguing for an automatic or a per se rule that the fourth prong will always be satisfied once the first three prongs of plain error are satisfied. And the answer is no. It's not a per se rule, it's not automatic. It's just because the nature of a guidelines error is such that it will travel together with the fourth prong in most instances. That is, when a defendant is serving more time in prison than he probably would have but for the error, that is an error that seriously affects the fairness, integrity, and public reputation of the proceedings. And every court of appeals but this court follows that rule. Some courts use the language of a presumption, the Tenth and maybe the Third Circuits. Others don't use that word. I don't think it really is meaningful to use presumption or not. The fact of the matter is most courts of appeals will find the fourth prong satisfied in these circumstances. Yeah. I mean it's interesting because that very issue is really the heart of what Rosales Morales will have to decide. Obviously you can keep the fourth prong in other cases but if you're going to say that in a sentence case a guidelines error always meets the fourth prong then I mean it is automatic at least in that context, maybe not in some other context because well obviously plain error applies to other things besides sentences. It just seems to come up in, I don't know, a large percentage of sentencing cases. Why isn't it a fair inference that here threat meant more than display brandish? It meant target. Well, it's because the definitions of otherwise use and brandish aren't necessarily intuitive and we have to assess that language threatened with a firearm against this very detailed and specific distinction that the guidelines draw between brandishment and otherwise use that makes it difficult to map the finding of the foreign court onto that distinction. And so, yes, inferences can be drawn but in my view it's perfectly plausible to infer that somebody could feel threatened with a firearm if two men with firearms, maybe a pistol tucked in their waistband are saying get in the van and grab them and force them to get in there without actually pointing the firearm at him. Yeah, but I just don't think we describe that way. I mean, again, colloquially I understand we as lawyers can pretty much make every word mean ten different things but it seems to me that if somebody walked up to someone with a firearm in their pocket you could feel threatened but you wouldn't say you were threatened with a firearm. You would say he had a gun in his pocket, I didn't feel I had a choice but to jump in the van with him or, you know, whatever. I think you would have said he had a gun in his pocket. One of these witnesses would have said it that way and they didn't. So that's why, again, I think your inference is not ridiculous, I'm just saying I don't think the inference drawn here is ridiculous either that it was a pointing. Well, what I would say is that another thing to take into consideration with the findings of the Mexican court is that the findings aren't very detailed, they aren't very specific and these were abbreviated proceedings and the judgment talks about this a little bit which from what I can gather is something akin to a C1C plea in U.S. federal court which is that the parties agree to recommend a specific sentence and there's not the contention over what the particular facts are and so forth so that everybody, it's essentially an agreed determination that the court signs off on so that would be a reason for why the more specific and detailed factual findings aren't here in the record. Fair enough. All right. Well, we appreciate your argument and we will take a short 10 minute recess.